# EXHIBIT F

ACO

# U.S. District Court
## Eastern District of New York (Central Islip)
## CIVIL DOCKET FOR CASE #: 2:17-cv-04834-BMC-GRB

| | |
|---|---|
| IQ Dental Supply, Inc. v. Henry Schein, Inc. et al | Date Filed: 08/17/2017 |
| Assigned to: Judge Brian M. Cogan | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Gary R. Brown | Nature of Suit: 410 Anti-Trust |
| Cause: 15:1 Antitrust Litigation | Jurisdiction: Federal Question |

**Plaintiff**

**IQ Dental Supply, Inc.**          represented by **Amy Christine Gross**
                                     Duane Morris LLP
                                     1540 Broadway
                                     New York, NY 10036
                                     212-692-1000
                                     Fax: 212-214-0553
                                     Email: acgross@duanemorris.com
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

                                     **James M. Parks**
                                     Duane Morris LLP
                                     30 S 17th Street
                                     Philadelphia, PA 19103
                                     215-979-1342
                                     Fax: 215-689-3682
                                     Email: jmparks@duanemorris.com
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

                                     **Lawrence C. Fox**
                                     Duane Morris LLP
                                     1540 Broadway
                                     New York, NY 10036
                                     212-692-1051
                                     Fax: 212-692-1020
                                     Email: lcfox@duanemorris.com
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

                                     **William B. Pollard , III**
                                     Duane Morris LLP
                                     1540 Broadway
                                     New York, NY 10036
                                     212-692-1000

Fax: 212-692-1020
Email: wbpollard@duanemorris.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Henry Schein, Inc.**                    represented by   **Colin Kass**
                                          Proskauer Rose
                                          1001 Pennsylvania Avenue
                                          Suite 600
                                          Washington, DC 20004
                                          202-416-6890
                                          Fax: 202-416-6899
                                          Email: ckass@proskauer.com
                                          *LEAD ATTORNEY*
                                          *PRO HAC VICE*
                                          *ATTORNEY TO BE NOTICED*

                                          **Adrian Fontecilla**
                                          Proskauer Rose LLP
                                          1001 Pennsylvania Ave Nw
                                          Suite 600 South
                                          Washington, DC 20004
                                          202-416-5863
                                          Fax: 202-416-6899
                                          Email: afontecilla@proskauer.com
                                          *ATTORNEY TO BE NOTICED*

                                          **Bradley I. Ruskin**
                                          Proskauer Rose LLP
                                          11 Times Square
                                          New York, NY 10036
                                          212-969-3465
                                          Fax: 212-969-2900
                                          Email: bruskin@proskauer.com
                                          *ATTORNEY TO BE NOTICED*

                                          **Stephen Robert Chuk**
                                          Proskauer Rose LLP
                                          1001 Pennsylvania Avenue Nw
                                          Suite 600
                                          Washington, DC 20004
                                          202-416-6697
                                          Fax: 202-416-6899
                                          Email: schuk@proskauer.com
                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Patterson Companies, Inc.**                    represented by    **James J. Long**
Briggs and Morgan, P.A.
2200 Ids Center
80 South Eighth Street
Minneapolis, MN 55402
612-977-8582
Fax: 612-977-8650
Email: jlong@briggs.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jay William Schlosser**
Briggs and Morgan, P.A.
2200 Ids Center
80 South Eighth Street
Minneapolis, MN 55402
612-977-8539
Fax: 612-977-8650
Email: jschlosser@briggs.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael B. Miller**
Morrison & Foerster LLP
250 West 55 Street
New York, NY 10019
212-468-8000
Fax: 212-468-7900
Email: mbmiller@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott M. Flaherty**
Briggs and Morgan, P.A.
Suite 2200
80 South Eighth Street
Minneapolis, MN 55402
612-977-8400
Fax: 612-977-8650
Email: sflaherty@briggs.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Benco Dental Supply Company** | represented by | **Howard D. Scher** |
| | | Buchanan Ingersoll & Rooney PC |
| | | 50 S 16th Street, Suite 3200 |
| | | Philadelphia, PA 19102 |
| | | 215-665-3920 |
| | | Fax: 215-665-8760 |
| | | Email: howard.scher@bipc.com |
| | | *LEAD ATTORNEY* |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |

**Kenneth L. Racowski**
Buchanan, Ingersoll & Rooney PC
Two Liberty Place
50 S 16th Street, Suite 3200
Philadelphia, PA 19102
215-665-3608
Fax: 215-665-8760
Email: kenneth.racowski@bipc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Lee Southall**
Buchanan Ingersoll & Rooney PC
2 Liberty Place
50 South 16 Street
Suite 3200
Philadelphia, PA 19102-2555
215-665-3884
Fax: 215-665-8760
Email: samantha.southall@bipc.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/17/2017 | 1 | COMPLAINT against Benco Dental Supply Company, Henry Schein, Inc., Patterson Companies, Inc. filing fee $ 400, receipt number 0207-9765559 Was the Disclosure Statement on Civil Cover Sheet completed -YES,, filed by IQ Dental Supply, Inc.. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons to Benco Dental Supply Company, # 3 Proposed Summons to Henry Schein, Inc., # 4 Proposed Summons Patterson Companies, Inc.) (Pollard, William) (Entered: 08/17/2017) |
| 08/17/2017 | 2 | NOTICE of Change of Firm, Address, Phone, Fax, Email by William B. Pollard, III (Pollard, William) (Entered: 08/17/2017) |
| 08/18/2017 | 3 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made. (Landow, Concetta) (Entered: |

| | | 08/18/2017) |
|---|---|---|
| 08/18/2017 | | Case Assigned to Judge Sandra J. Feuerstein and Magistrate Judge Steven I. Locke. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Landow, Concetta) (Entered: 08/18/2017) |
| 08/18/2017 | 4 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences. Do NOT return or file the consent unless all parties have signed the consent.** (Landow, Concetta) (Entered: 08/18/2017) |
| 08/18/2017 | 5 | Summons Issued as to Henry Schein, Inc. (Landow, Concetta) (Entered: 08/18/2017) |
| 08/18/2017 | 6 | Summons Issued as to Patterson Companies, Inc. (Landow, Concetta) (Main Document 6 replaced on 8/18/2017) (Landow, Concetta). (Entered: 08/18/2017) |
| 08/18/2017 | 7 | Summons Issued as to Benco Dental Supply Company. (Landow, Concetta) (Entered: 08/18/2017) |
| 08/18/2017 | 8 | Notice of Related Case indicated on the civil cover sheet in case 17-CV-4834 (SJF)(SIL). (Landow, Concetta) (Entered: 08/18/2017) |
| 08/18/2017 | | The summons for 6 Patterson Companies, Inc. was originally uploaded with a blank summons. It was replaced with the correct one. (Landow, Concetta) (Entered: 08/18/2017) |
| 08/18/2017 | 9 | NOTICE of Appearance by Lawrence C. Fox on behalf of IQ Dental Supply, Inc. (aty to be noticed) (Fox, Lawrence) (Entered: 08/18/2017) |
| 08/18/2017 | 10 | NOTICE of Appearance by Amy Christine Gross on behalf of IQ Dental Supply, Inc. (aty to be noticed) (Gross, Amy) (Entered: 08/18/2017) |
| 08/21/2017 | | NOTICE of Hearing: Initial Conference set for 12/12/2017 at 11:15 AM in Courtroom 1010 before Judge Sandra J. Feuerstein at the Central Islip Courthouse, located at 100 Federal Plaza, Central Islip, New York 11722. The parties shall appear with authority, or with individuals with authority, to settle this matter. Plaintiff shall serve a copy of this Notice of Hearing on Defendants and file proof of such service with the Court. c/ECF (Walsh, Kenneth) (Entered: 08/21/2017) |
| 08/22/2017 | | ORDER REASSIGNING CASE. Case reassigned to Judge Brian M. Cogan for all further proceedings. Judge Sandra J. Feuerstein no longer assigned to case |

|  |  | Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such.. Ordered by Chief Judge Dora Lizette Irizarry on 8/22/2017. (Davis, Kimberly) (Entered: 08/22/2017) |
|---|---|---|
| 08/22/2017 | 11 | NOTICE of Appearance by James M. Parks on behalf of IQ Dental Supply, Inc. (aty to be noticed) (Parks, James) (Entered: 08/22/2017) |
| 08/22/2017 |  | Case Reassigned to Magistrate Judge Gary R. Brown. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Marziliano, August) (Entered: 08/22/2017) |
| 08/22/2017 | 12 | SCHEDULING ORDER: Initial Status Conference is set for 9/11/2017 at 9:45 AM **in Chambers 704S. SEE ATTACHED MANDATORY REQUIREMENTS FOR THE CONFERENCE**. Ordered by Judge Brian M. Cogan on 8/22/2017. (Weisberg, Peggy) (Entered: 08/22/2017) |
| 08/29/2017 | 13 | SUMMONS Returned Executed by IQ Dental Supply, Inc.. Benco Dental Supply Company served on 8/18/2017, answer due 9/8/2017. (Fox, Lawrence) (Entered: 08/29/2017) |
| 08/29/2017 | 14 | SUMMONS Returned Executed by IQ Dental Supply, Inc.. Henry Schein, Inc. served on 8/21/2017, answer due 9/11/2017. (Fox, Lawrence) (Entered: 08/29/2017) |
| 08/29/2017 | 15 | SUMMONS Returned Executed by IQ Dental Supply, Inc.. Patterson Companies, Inc. served on 8/22/2017, answer due 9/12/2017. (Fox, Lawrence) (Entered: 08/29/2017) |
| 09/06/2017 | 16 | Letter *Joint Letter to Court in Advance of Initial Status Conference* by IQ Dental Supply, Inc. (Fox, Lawrence) (Entered: 09/06/2017) |
| 09/06/2017 | 17 | NOTICE of Appearance by Bradley I. Ruskin on behalf of Henry Schein, Inc. (aty to be noticed) (Ruskin, Bradley) (Entered: 09/06/2017) |
| 09/06/2017 | 18 | NOTICE of Appearance by Adrian Fontecilla on behalf of Henry Schein, Inc. (aty to be noticed) (Fontecilla, Adrian) (Entered: 09/06/2017) |
| 09/06/2017 | 19 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0207-9809218. by Henry Schein, Inc.. (Attachments: # 1 Affidavit and Certificates of Good Standing, # 2 Proposed Order) (Kass, Colin) (Entered: 09/06/2017) |
| 09/06/2017 | 20 | NOTICE of Appearance by Stephen Robert Chuk on behalf of Henry Schein, Inc. (aty to be noticed) (Chuk, Stephen) (Entered: 09/06/2017) |
| 09/07/2017 | 21 | NOTICE of Appearance by Samantha Lee Southall on behalf of Benco Dental Supply Company (aty to be noticed) (Southall, Samantha) (Entered: 09/07/2017) |
| 09/07/2017 |  | ELECTRONIC ORDER granting 19 Motion for Leave to Appear Pro Hac Vice |

|  |  | The attorney shall register for ECF, registration is available online at the NYEDs homepage. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure that the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee* . Ordered by Magistrate Judge Gary R. Brown on 9/7/2017. c/ecf (Johnston, Linda) (Entered: 09/07/2017) |
|---|---|---|
| 09/08/2017 | 22 | NOTICE of Appearance by Michael B. Miller on behalf of Patterson Companies, Inc. (aty to be noticed) (Miller, Michael) (Entered: 09/08/2017) |
| 09/11/2017 |  | Minute Entry and Order for Initial Status Conference held on 9/11/2017 before Judge Brian M. Cogan. Counsel for all parties present. Defendants' Motion to Dismiss due 10/2/2017; opposition 10/23/2017; reply 11/2/2017. See transcript for details. (Court Reporter: Victoria Butler). (Weisberg, Peggy) (Entered: 09/11/2017) |
| 09/13/2017 | 23 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0207-9825105. by Benco Dental Supply Company. (Attachments: # 1 Affidavit Of Howard Scher and Certificate of Good Standing, # 2 Proposed Order) (Scher, Howard) (Entered: 09/13/2017) |
| 09/13/2017 | 24 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0207-9825141. by Benco Dental Supply Company. (Attachments: # 1 Affidavit of Kenneth Racowski and Certificate of Good Standing, # 2 Proposed Order) (Racowski, Kenneth) (Entered: 09/13/2017) |
| 09/14/2017 |  | ELECTRONIC ORDER granting 23 Motion for Leave to Appear Pro Hac Vice The attorney shall register for ECF, registration is available online at the NYEDs homepage. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure that the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee* . Ordered by Magistrate Judge Gary R. Brown on 9/14/2017. C/ECF (Johnston, Linda) (Entered: 09/14/2017) |
| 09/14/2017 |  | ELECTRONIC ORDER granting 24 Motion for Leave to Appear Pro Hac Vice The attorney shall register for ECF, registration is available online at the NYEDs homepage. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure that the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee* . Ordered by Magistrate Judge Gary R. Brown on 9/14/2017. C/ECF (Johnston, Linda) (Entered: 09/14/2017) |
| 09/18/2017 | 25 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0207-9836515. by Patterson Companies, Inc.. (Attachments: # 1 Affidavit, # 2 Exhibit Certificate of Good Standing, # 3 Exhibit Certificate of Good Standing, # 4 Exhibit Certificate of Good Standing, # 5 Proposed Order) (Flaherty, Scott) (Entered: 09/18/2017) |

| 09/19/2017 | | ELECTRONIC ORDER granting 25 Motion for Leave to Appear Pro Hac Vice The attorney shall register for ECF, registration is available online at the NYEDs homepage. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure that the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee* . Ordered by Magistrate Judge Gary R. Brown on 9/19/2017. C/ECF (Johnston, Linda) (Entered: 09/19/2017) |
| 09/20/2017 | 26 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0207-9843097. by Patterson Companies, Inc.. (Attachments: # 1 Affidavit, # 2 Exhibit Certificate of Good Standing, # 3 Exhibit Certificate of Good Standing, # 4 Proposed Order) (Long, James) (Entered: 09/20/2017) |
| 09/20/2017 | 27 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0207-9843183. by Patterson Companies, Inc.. (Attachments: # 1 Affidavit, # 2 Exhibit Certificate of Good Standing, # 3 Proposed Order) (Schlosser, Jay) (Entered: 09/20/2017) |
| 09/20/2017 | 28 | MOTION for Refund of Fees Paid Electronically by Patterson Companies, Inc.. (Attachments: # 1 Exhibit Receipt No.0207-9843132, # 2 Exhibit Receipt No. 0207-9843183) (Schlosser, Jay) (Entered: 09/20/2017) |
| 09/21/2017 | | ELECTRONIC ORDER granting 26 Motion for Leave to Appear Pro Hac Vice The attorney shall register for ECF, registration is available online at the NYEDs homepage. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure that the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee* . Ordered by Magistrate Judge Gary R. Brown on 9/21/2017. C/ECF (Johnston, Linda) (Entered: 09/21/2017) |
| 09/21/2017 | | ELECTRONIC ORDER granting 27 Motion for Leave to Appear Pro Hac Vice The attorney shall register for ECF, registration is available online at the NYEDs homepage. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure that the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee* . Ordered by Magistrate Judge Gary R. Brown on 9/21/2017. C/ECF (Johnston, Linda) (Entered: 09/21/2017) |
| 09/22/2017 | 29 | 28 Application for Refund of Fees Paid Electronically. Approved by August Marziliano, Operations Manager on 9/22/2017. (Marziliano, August) (Entered: 09/22/2017) |
| 10/02/2017 | 30 | MOTION to Dismiss - *Defendants' Motion to Dismiss* by Henry Schein, Inc.. (Kass, Colin) (Entered: 10/02/2017) |
| 10/02/2017 | 31 | MEMORANDUM in Support re 30 MOTION to Dismiss - *Defendants' Motion to Dismiss* filed by Henry Schein, Inc.. (Attachments: # 1 Certificate of Service) (Kass, Colin) (Entered: 10/02/2017) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/13/2017 14:00:01 | | | |
| **PACER Login:** | Prosk0036:4786464:0 | **Client Code:** | 36142/060/9664 |
| **Description:** | Docket Report | **Search Criteria:** | 2:17-cv-04834-BMC-GRB |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IQ DENTAL SUPPLY, INC.,<br><br>               Plaintiff,<br><br>    v.<br><br>HENRY SCHEIN, INC., PATTERSON COMPANIES, INC., and BENCO DENTAL SUPPLY COMPANY,<br><br>               Defendants. | Case No.: 2:17-cv-4834<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff IQ Dental Supply, Inc. (hereinafter "IQ Dental" or "IQ"), for its Complaint against Defendants Henry Schein, Inc. ("Schein"), Patterson Companies, Inc. ("Patterson"), and Benco Dental Supply Company ("Benco"), with knowledge as to its own actions and otherwise on information and belief, alleges:

<u>**NATURE OF THIS ACTION**</u>

1.     IQ Dental sues to recover its damages caused by an ongoing antitrust conspiracy among the three largest distributors in the $10 billion U.S. market for dental supplies and equipment -- Defendants Schein, Patterson, and Benco.  Beginning in late 2013, those "Big Three" distributors agreed among themselves and with others to further their long-standing efforts to control that market, by boycotting and attempting to destroy a dynamic new online distribution platform through which IQ Dental sells dental products to dentists, in direct competition with Schein, Patterson and Benco.

2.     That first-of-its-kind online dental marketplace -- operated by a company called SourceOne Dental ("SourceOne"), and supplied with products sold to dentists by IQ --

represented a disruptive new business model in the industry, offering dentists high-quality dental products with superior purchasing ease and efficiency, and at much lower prices, than the traditional sales model employed by Schein, Patterson and Benco.

3.  In addition to a SourceOne-branded e-commerce website (sourceonedental.com), the new business model included a plan to launch separate State-specific websites across the country in partnership with State dental associations. Each such website would bear the name and imprimatur of the State dental association, adding the association's endorsement of the offered products and the collective buying power of its members to the platform's other advantages. At the time Defendants began attacking that new business model, a website sponsored by the Texas Dental Association had already been launched, with the Arizona and Nevada associations soon to follow, and a roll-out to many other States was expected in the near future.

4.  The innovative SourceOne e-commerce business model, offering products sold by IQ and endorsed by State dental associations, posed an existential threat to the market dominance and control, and to the inflated prices and profit margins, that Schein, Patterson and Benco have long enjoyed and enforced through their joint anticompetitive conduct. As the representative of one state dental association predicted, the successful nationwide roll-out of the new business model would have meant that "it's all over for the big 3" -- Schein, Patterson and Benco.

5.  In response to that threat, Defendants coordinated an anticompetitive assault on the new enterprise that took three primary forms:

6.   First, Defendants used their market clout to coerce manufacturers of dental products not to sell to IQ Dental or through the SourceOne/dental association websites. Because Defendants hold such a dominant share of the market for dental product sales -- as much as 90%

2

of it -- Defendants were able to cow manufacturers into pulling their products from those websites rather than risk being removed from Defendants' distribution channels.

7.      Second, Defendants agreed among themselves and with manufacturers to mobilize and threaten coordinated boycotts of participating State dental associations and their trade shows, to punish them for partnering with SourceOne/IQ and to dissuade other State associations from doing so. Because revenues from those trade shows make up a substantial portion of the operating income of state dental associations, and because the absence of Defendants and boycotting manufacturers would be very damaging to those trade shows, those boycotts and threatened boycotts deterred many state associations from adopting the new business model and launching their own websites through SourceOne. That, in turn, prevented the new business model from spreading across the country just as it was poised to do so, and prevented IQ from reaping the very substantial rewards of being the principal seller of products through those websites.

8.      Third, Defendants agreed among themselves to boycott, and did boycott, dentists who purchased dental supplies through the SourceOne/dental association websites and directly from IQ, by withholding essential repair and maintenance services for those dentists' equipment.

9.      Defendants also engaged in a coordinated effort to falsely disparage SourceOne and IQ and their products and services, with the intent and effect of inducing dentists not to purchase supplies and equipment from IQ or through the SourceOne websites.

10.     Defendants' plan and anticompetitive intent was on full display in their internal and inter-company communications. For example, in November 2013, two Schein employees wrote each other about boycotting the annual trade show of the Texas Dental Association ("TDA"), with one employee saying: "Let's talk with P[atterson], Benco, . . . [and] [n]ot give

TDA a dime," and the other responding: "I refuse to work with any manufacturer rep that sells through [SourceOne]. That's [what] every distributor should say. The manufacturers will get scared and pull out." At about the same time, Texas regional managers for Schein and Benco had a phone conversation (memorialized in an email exchange) in which they discussed coordinating their efforts to boycott the TDA trade show and reaching out to Patterson "to see if they would consider pulling out as well." Those early machinations culminated a few months later, when Schein, Patterson, and Benco, along with many dental manufacturers at their behest, boycotted the April 2014 TDA trade show, causing long-term damage both to the TDA's nascent online program and to the prospects for launching such programs in other States.

11. The concerted illegal conduct by Schein, Patterson and Benco had the intended effect of scaring off product manufacturers, additional State dental associations, and dentists from doing business with SourceOne and IQ, thus preventing the expansion (geographic and otherwise) of the SourceOne/dental association web platforms and IQ's supply and customer relationships. But for Defendants' anticompetitive conduct, those platforms would have spread nationwide, and IQ's sales via those platforms would have increased exponentially. As one industry participant observed, the SourceOne/dental association websites would have proliferated across the country in a "nano-second" if not for Defendants' unlawful conduct.

12. Defendants' coordinated efforts to suppress competition from IQ, SourceOne and the State dental associations were an extension of the concerted anticompetitive conduct -- including price-fixing and margin-fixing -- that Defendants had been engaging in for at least a decade. A conversation recorded in 2008 between a Schein representative and a representative of a smaller distributor exposes the nature of the Defendants' illegal arrangement and captures the brazenness of their conduct. In that conversation, the Schein representative tries to persuade the

smaller distributor to participate in Defendants' price-fixing conspiracy, saying: "If we're both quoting a deal, let's make sure that we're both getting the same thing. . . . [That way] we know that the customer is making a decision based on who they want to do business with -- not because we're slugging it out and killing each other on margins."

13.     Defendants' anticompetitive and tortious conduct had no legitimate business justification.  The only rationale for Defendants' boycott of manufacturers and dental associations that deal with SourceOne and IQ Dental is the elimination of lower-cost, high quality and innovative competition, with the purpose and actual effect of furthering their dominance and control of the market for dental supplies and equipment and artificially maintaining or increasing the prices paid by dentists for those products.

14.     Defendants' anticompetitive and illegal conduct has severely limited and inhibited IQ's growth and sales, and has cost IQ many millions of dollars in lost profits.

## THE PARTIES

15.     Plaintiff IQ Dental is a New Jersey corporation with its principal place of business at 353 US Highway 46, Building "C", Suite 120, Fairfield, New Jersey 07004-2415.  IQ Dental sells dental supplies and equipment to dentists, including in the Eastern District of New York and elsewhere in the United States, including but not limited to New Jersey, Connecticut, Maryland, Florida, Texas, Arizona, Nevada, and Georgia.

16.     Defendant Schein is a Delaware corporation with its principal place of business at 135 Duryea Road, Melville, New York 11747.  Schein sells dental supplies and equipment to dentists, including in the Eastern District of New York and elsewhere, and operates from multiple distribution centers and 81 showrooms throughout the United States.

17.     Defendant Patterson is a Minnesota corporation with its principal place of

business at 1031 Mendota Heights Road, St. Paul, Minnesota 55120.  Patterson sells dental

supplies and equipment to dentists, including in the Eastern District of New York and elsewhere,

and operates from eight distribution centers and more than 80 branch offices throughout the

United States.

18.     Defendant Benco is a Delaware corporation with its principal place of business at

295 Centerpoint Boulevard, Pittston, Pennsylvania 18640.  Benco sells dental supplies and

equipment to dentists, including in the Eastern District of New York and elsewhere, and operates

from five distribution centers and 44 showrooms throughout the United States.

## JURISDICTION AND VENUE

19.     IQ Dental brings this action to recover damages, including treble damages, cost of

suit, and reasonable attorneys' fees, as well as injunctive relief, arising from Defendants'

violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

20.     This Court has subject matter jurisdiction over IQ Dental's federal claims

pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust

regulation).

21.     Defendants are engaged in, and their activities substantially affect, interstate trade

and commerce.  Defendants' distribution centers facilitate the sale of dental supplies and

equipment to dental practices nationwide, in a continuous and uninterrupted flow of commerce

across state lines.

22.     As the dental supplies and equipment at issue in this action are sold in interstate

commerce, the price impact on dental supplies and equipment distribution flowing from

Defendants' unlawful conduct has had a substantial effect upon interstate commerce.

23.     IQ Dental has standing to bring this action under Sections 4 and 16 of the Clayton

Act, 15 U.S.C. §§ 15, 26.

24.     This Court has subject matter jurisdiction over IQ Dental's pendent state law claims pursuant to 28 U.S.C. § 1367.  Each of IQ Dental's state law claims arise out of the same factual nucleus as its federal law claims.  Moreover, this Court has subject matter jurisdiction over IQ Dental's state law claims pursuant to 28 U.S.C. § 1332, because total diversity exists between IQ Dental and each of the Defendants and the amount in controversy exceeds $75,000.

25.     Venue is proper in this Court under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391, because each Defendant transacts business and is subject to personal jurisdiction within the Eastern District of New York.  Each Defendant sells dental supplies and equipment in or for delivery into the Eastern District of New York, and operates showrooms or other places of business within that District.

## **FACTUAL BACKGROUND**

### A.     **The Dental Products Industry and Defendants' Market Power**

26.     Dentists use and consume a wide variety of different supplies in their practices, including films, cements, syringes, instruments, abrasives, polishes, pastes, implants, solutions, dressings, bite-wings, waxes, rinses, and many other items.  The market for dental supplies and equipment in the United States is approximately $10 billion annually.  There are over 120,000 private dental practices in the United States, and the average practice purchases more than $80,000 of supplies and equipment per year.  Dental practices on average use 100 or more different types of supplies each month, and spend 5-7% of their annual revenue to purchase supplies used in the daily operations of their practices.

27.     There are over 300 dental supplies and equipment manufacturers, none of which offer the full range of dental supplies and equipment necessary to run a dental practice. Dental

supplies and equipment manufacturers sell their products either directly to dental professionals, or to wholesale distributors, including the Defendants. The vast majority of dental supplies and equipment are sold by manufacturers to wholesale distributors, who in turn resell those supplies and equipment to dental professionals at a substantial profit. Distributors carry broad product lines of dental supplies and equipment and employ sales representatives to service their customers. Manufacturers tend to sell through distributors due to the convenience and "one-stop shopping" that distributors can offer dentists. Because dentists need a wide range of supplies and equipment in the daily operation of their practices, direct purchases from manufacturers require a complicated and time-consuming series of individual transactions, with additional paperwork and recordkeeping. In contrast, purchases from distributors allow dentists to consolidate their purchases with a single supplier, with significant savings in time and effort. The convenience of purchasing dental supplies and equipment through distributors allows distributors to charge a substantial mark-up on the price of dental supplies, referred to as the "margin."

28.     As detailed below, Defendants have engaged in a long-standing conspiracy to fix prices and margins and suppress competition in the industry, which has allowed them to regularly increase their margins without losing market share, to levels that are now 35% or higher.  The boycotts and other anticompetitive conduct described in this Complaint are an extension of that long-standing conspiracy in response to a new and very formidable competitive threat -- e-commerce websites offering ease of access and use, lower prices, dental association endorsement, and other features that Defendants simply could not match. Those competitive advantages threatened to induce dentists to switch some or all of their purchases from Defendants to IQ, or to force Defendants to lower their prices and margins, or both.

29.     Historically, Schein, Patterson and Benco have been able to successfully fix

8

prices and margins and suppress competition because of their dominance in a concentrated market. Schein, Patterson and Benco collectively account for 80-90% of the sales in that market, with Schein currently holding approximately a 41% market share, Patterson 34% and Benco 10%. The Herfindahl-Hirschman index, a commonly accepted measure of market concentration, for the dental supplies distribution market is over 2500, a level characterized as "highly concentrated" by federal antitrust enforcement agencies.

30. Defendants' market shares are protected by substantial barriers to entry and expansion of new distributor-competitors, including the ongoing need for substantial capital to maintain the needed dental product inventory to be competitive in the marketplace. Those market shares are also protected by Defendants' anticompetitive conduct.

31. Over time, demand in the market for dental supplies and equipment has been largely static. If the market had been operating freely, that static demand should have led distributor-competitors to undercut each other's prices to gain market share. However, Defendants' conspiracy to fix prices and margins has pre-empted such price competition, enabling Defendants to raise their prices in near lockstep year after year. Rising prices in a static market like this one demonstrates that the market has been distorted by anticompetitive conduct.

**B.      IQ Dental's Business**

32. Sergey Kunin is the founder and chief executive of IQ Dental. Mr. Kunin emigrated to the United States in 1994, not speaking any English, and began working in the receiving department of Becker Parkin Dental Supply. Over 13 years, Mr. Kunin worked his way up the ranks at Becker Parkin, eventually becoming its Executive Vice President. In that role, Mr. Kunin was largely responsible for Becker Parkin's operations, and for dramatically increasing Becker Parkin's sales. In 2007, Defendant Schein acquired Becker Parkin. Mr.

9

Kunin was the only Becker Parkin executive to be hired by Schein, serving as Director of Business Relationships under Executive Vice President Mark Mlotek and working closely with Schein's Chief Executive Officer Stanley Bergman.

33.     In 2009, Mr. Kunin founded IQ Dental.  IQ sells dental supplies to dental practices nationwide.  It also sells dental equipment to dental practices, primarily but not exclusively in the Eastern United States, and provides servicing for the equipment it sells.  IQ Dental sells to individual and group dental practices of all sizes.

34.     IQ has branch offices in New Jersey, Connecticut, and Long Island.

35.     As detailed below, IQ Dental has been and is the principal seller of dental supplies through the SourceOne/dental association websites, selling approximately 90% of the products sold through those platforms.

**C.     Defendants' Boycott Begins And IQ Becomes the Principal**
        **Supplier for the SourceOne/Dental Association Websites**

36.     SourceOne is an online marketer that operates dental-supply e-commerce websites, both in its own name (sourceonedental.com) and in partnership with State dental associations (the "Dental Association Websites") (together, the "Websites").  The Websites, the first of their kind in the dental industry, provide dentists the convenience and benefit of one-stop online shopping for high-quality dental products at substantially lower prices than those charged by Defendants for the same products.

37.     SourceOne does not supply or sell the dental products offered on the Websites.  SourceOne operates the Websites, but the products are supplied and sold primarily by IQ, which conducts the transactions, fills the orders, and ships the products directly to the dentists. The Websites identify IQ as the seller of the product.  IQ pays SourceOne a commission on each sale that IQ makes and, on sales through the Dental Association Websites, SourceOne remits a

commission to the State dental association.

38.     The first Dental Association Website to be launched was sponsored by the Texas Dental Association.  That website, branded as "TDA Perks Supplies," started in October 2013.  It was followed soon thereafter by websites sponsored by the Arizona Dental Association (in June 2014) and the Nevada Dental Association (in early 2015).

39.     The SourceOne and Dental Association Websites, and the new business model they represented, posed a serious threat to Defendants and their dominance and control in the market for dental supplies.  Defendants do not have strong self-generating internet sales, having long relied on a network of on-the-ground regional sales representatives who make in-person sales calls on their dentist customers.  The sales Defendants make over the internet are primarily to existing customers at prices set independent of their websites.

40.     Recognizing the threat from the Websites and their new e-commerce business model, Defendants immediately set about trying to destroy them.  Building on their historic culture of cooperation and communication, the Defendants engaged in ongoing communications, about the SourceOne platform, IQ Dental, and the Dental Association Websites. Defendants shared information about market participants' reactions to those competitive threats, they collectively developed a response, and they provided reassurances to market participants about that collective response. Defendants negotiated, reached and implemented this collusive response because, as Defendants themselves explained to numerous marketplace participants, the Websites and the new business model posed an unprecedented threat to Defendants, their revenues, and profits.

41.     Initially, the supplies sold through the TDA Perks and Arizona websites were sold by distributors other than IQ, first by a distributor called DDS, and then by Arnold Dental.

11

However, between October 2013 and April 2014, Schein, Patterson and Benco tried to choke off the threat by pressuring manufacturers to stop supplying DDS and Arnold.

42.     As a result, dozens of product lines, including many of the best sellers, became unavailable through the Websites.  DDS and Arnold told SourceOne that the manufacturers of those products were reacting to pressure from Defendants to stop doing business through the Websites.  For example, DMG America, a manufacturer of dental restoration products, told DDS that DMG America was withdrawing permission for its products to be sold through the Websites due to pressure from Schein and Patterson.  Other manufacturers who instructed DDS and Arnold to remove their products from the Websites include Sultan Healthcare, Danaher, Heraeus Kulzer, Ivoclar Vivadent, Quala and Septodont.  By April 2014, the Websites had lost access to thousands of key dental supplies and at least 75% of their formerly top-selling products.

43.     Defendants' tactics achieved their objectives.  DDS and Arnold soon succumbed to the Defendants' pressure, terminated their relationships with SourceOne, and stopped selling through the Websites.  SourceOne sought a replacement supplier, initially without success.  One candidate, DHP Dental ("DHP"), told SourceOne that it was deterred from selling through the Websites when it met with managers from several dental supply and equipment manufacturers and was told of the effect of Defendants' boycott.

44.     Having lost its principal distributors to Defendants' pressure, and with other candidates deterred by Defendants' boycott, SourceOne, in May 2014, reached out to IQ Dental. After brief negotiations, IQ signed a contract with SourceOne, and became the predominant seller on the Websites.

45.     Since then, IQ has sold approximately 90% of the product sold through the Websites.

12

D.     **Defendants Boycott the State Dental Associations**

46.     As part of their anticompetitive campaign against the Websites, Defendants also attacked the participating State dental associations, including by collectively boycotting the associations' annual trade shows.

47.     State dental associations depend on revenues from their annual trade shows (usually held in conjunction with their annual meetings), which are their most important events of the year.  Revenues from those events, including registration fees, exhibition fees, and advertising fees, are substantial components of a state dental association's budget.  Because Schein, Patterson and Benco are the dominant distributors in the industry, their participation is essential to a successful event.

48.     Schein, Patterson and Benco usually send representatives to attend and participate in those trade shows.  However, to punish associations that sponsored Dental Association Websites, and to deter other associations from doing so, Defendants agreed to boycott the participating associations' shows, starting with the TDA trade show in April 2014, and persuaded other companies to join their illegal action.

(1)     **Defendants Boycott the Texas Dental Association**

49.     On or about October 15, 2013, Schein's South Texas Regional Manager had a telephone conversation with a Benco Regional Manager regarding the TDA's partnership with SourceOne.   As shown in an email memorializing the call, the Schein and Benco managers discussed their mutual interest in boycotting the TDA and its trade show and agreed that their companies would enlist Patterson to do the same.  The email specifically stated, *inter alia*:

- "Benco considering suspending all activities with the TDA including pulling out of the state show;"

- "[A Managing Director of Benco] will be reaching out to, or has reached out to, [the President of Schein] to see if [Schein] would do the same thing;"

13

- "[The Benco Regional Manager] wanted to know if I have a relationship with local [Patterson Regional Manager] to see if they would consider pulling out as well;" and

- The Benco and Schein Regional Managers planned to meet for lunch "to discuss concerns and share what we have found about the program."

50.     On November 1, 2013, a Schein employee wrote to a colleague: "Let's talk with P[atterson], Benco, . . . [and] [n]ot give TDA a dime."  The other Schein employee responded, "I refuse to work with any manufacturer rep that sells through [SourceOne].  That's [what] every distributor should say.  The manufacturers will get scared and pull out."

51.     In March of 2014, a Patterson representative met with TDA representatives and demanded that TDA end its relationship with SourceOne, or Patterson would withdraw from TDA's trade show and refuse to advertise in TDA's publication.  In April of 2014, a Schein representative delivered an identical message to TDA.

52.     On April 29, 2014, the day before the TDA annual meeting was scheduled to start, a Benco employee tweeted: "[T]exas meeting will not be the same without key venders [sic] there.  #skiptheTDA."  The tweet appears to have since been deleted to conceal its incriminating content.

53.     The TDA did not end its relationship with SourceOne, and Schein, Patterson and Benco all pulled out of the 2014 TDA trade show at the last minute.

54.     More than a dozen manufacturers also joined the boycott of the TDA show under pressure from Defendants.

55.     For example, a sales representative from Tuttnauer, which manufactures dental sterilization devices, told a representative of distributor Archer & White that Tuttnauer and other manufacturers intended to join Defendants' boycott of the TDA trade show as a result of pressure from Defendants, and encouraged Archer & White to boycott the event, too.  The

Tuttnauer representative specifically stated that the planned boycott was in response to the

TDA's affiliation with SourceOne.

56.     Moreover, a March 31, 2014 email thread forwarded by David McCarley of

McCarley Dental said that at the recent South Dental Convention:

> some of the vendors say that they were told by both Patterson and
> Schein not to have anything to do with TDA Perks or they would
> shelve their products nationwide. . . . when I spoke with a Schein
> rep at their normal sized [booth], he said that they were still having
> higher-up corporate discussions on whether they would attend the
> TDA or not, and that Benco was discussing the same. . . .[T]hey
> really do think that they can derail the [TDA] Perks program.

That same email thread reflects that "Big Dental Suppliers are sending false info to Dentists

[about SourceOne]. Patterson reps have even called the TDA pretending to be Dentists

complaining. We have traced the calls back to the Reps."

57.     An April 21, 2014 SourceOne email, with the subject line "Group Boycott of our

company organized by largest dental suppliers," stated that "TDA has received a significant

number of cancel[l]ations for their annual session (April 30 – May 3) from a variety of

manufacturers previously confirmed to exhibit. Many of them cited pressure from both Henry

Schein and Patterson as the reason for the last minute cancel[l]ation. Many of them informed the

TDA that they were specifically threatened by both companies that if they did not cancel their

attendance at the conference, various unpleasant things would happen to them."

58.     As a result of the group boycott of the 2014 TDA show orchestrated by

Defendants, the show had significantly fewer exhibitors, and was significantly less profitable for

the TDA, than previous shows. Defendants' boycott was intended to send a message to the TDA

and other State dental associations, many of which were actively interested in partnering with

SourceOne, to refrain from doing so or suffer the same consequences.

59.     Defendants' tactics had the intended effect.  If not for Defendants' boycott of the TDA, the new Dental Association Website model would have spread rapidly to other States. As a TDA representative put it in an April 9, 2014 email, the "next link" would be that "the American Dental Association and most large states would onboard in a nano-second, and that is the reason for the suppliers' fear."  However, after the boycott of the 2014 TDA show, other state associations that had expressed an interest in sponsoring their own websites backed off, citing their fear of being targeted with the same kind of boycott Defendants imposed on the TDA.

**(2)     Defendants Boycott the Arizona Dental Association**

60.     That fear was well founded, as the Arizona Dental Association ("AZDA") soon learned.

61.     After the AZDA agreed in 2014 to sponsor its own Dental Association Website, Schein, Patterson and Benco retaliated by threatening to boycott the AZDA's annual meeting and trade show in March 2015.  The AZDA tried to avert the boycott by offering to make changes to its Website that would downplay the AZDA's involvement.  But those attempts did not appease Defendants, and they boycotted the 2015 AZDA show.

62.     In the months before the scheduled 2015 AZDA trade show, Schein, Patterson and Benco discussed their intention to undermine it.  For example, a July 22, 2014 email from Mike Wade of Benco to Daniel Reinhardt of Patterson said: "We are of the same mindset.  It would be gratifying to see every distributor with a local presence make a unified statement on the AZDA's ill-conceived idea" to work with SourceOne.  Reinhardt confirmed that Patterson "will be pulling our sponsorship and attendance of the state meeting," and Wade confirmed that Benco would be "looking at pulling our sponsorship."  Wade acknowledged that he "knows that Patterson, Schein and Benco boycotted the Texas Dental Association meeting this year after the

16

TDA did the same thing and [that he] wanted to see if we could create the same message here in AZ."

63. On July 30, 2014, Mike Wade of Benco wrote about the AZDA boycott to Brian Goslee of Dentsply, a major dental manufacturer, saying: "I have communicated with our competition at Schein and Patterson and we are all of the same mind that we will not be supporting a competitor's [AZDA's] meeting next year."

64. An August 1, 2014 Benco email states that Benco is "extremely disappointed that the AZDA has decided to directly compete with Benco and our fellow distributors," and that Benco "is not alone in evaluating [its] participation in AZDA events. Both Patterson and Schein leadership have expressed that they will also review participation if the AZDA continues to" affiliate with SourceOne.

65. As with their boycott of the TDA show the previous year, Schein, Patterson and Benco again pressured dozens of manufacturers to pull out of the AZDA show, and those manufacturers communicated to the AZDA that their decision to withdraw was a result of pressure from Schein and Patterson. Likewise, Defendants' boycott inflicted substantial losses on the AZDA and its trade show. Since then, the AZDA has not actively promoted its Dental Association Website.

66. Defendants' group boycotts of trade shows can only be explained by collective anticompetitive animus. By shunning those shows, Defendants forfeited the year's best opportunities to sell their products, in person, to concentrated gatherings of dentists (as well as substantial deposits on exhibition space). As Benco's Managing Director Rick Cohen has stated, in the normal course "not attending trade shows is not an option for us." The only reason Defendants would forfeit such prime sales opportunities was that they thought they needed to do

so in order to squelch a serious competitive threat. Defendants lessened the risk of losing customers to rival distributors by ensuring that they all boycotted the shows <u>together</u>.

**(3)    Defendants' Tactics Deter Additional Dental Association Websites**

67.    At a meeting of the American Dental Association ("ADA") in Chicago in July 2014, Ahmed Shams, CEO of SourceOne, presented the SourceOne business model to representatives of approximately 25 state dental associations. His presentation was very well received, and a number of State associations expressed active interest. In each instance, however, after recognizing the certainty that Defendants would mobilize a boycott against them if they pursued a program with SourceOne, the associations backed away. That pervasive intimidation suppressed competition for sales of dental products in each of those State markets, and in the many others where Dental Association Websites would have started and flourished if not for the threat of Defendants' boycotts. Those threats severely damaged IQ, which would have seen its sales explode if it had the opportunity to distribute its products over those Websites. For example:

68.    At the July 2014 ADA meeting in Chicago, the Ohio Dental Association's representative was ready to sign on to a partnership with SourceOne. After that meeting, however, the Ohio representative emailed Mr. Shams that Schein and Patterson had threatened to take action against the Ohio Dental Association if it proceeded with a SourceOne website, and the Association therefore would not be going forward with the planned relationship.

69.    Defendants' boycotts also dissuaded the Virginia Dental Association ("VDA") from pursuing a relationship with SourceOne. Internal VDA notes reflect its awareness that the TDA "has had some major pushback from the suppliers because of [SourceOne's] program. They had 15 companies pull out of the exhibiting at the TDA Annual meeting in response to the

18

[SourceOne] endorsement and have had some real issues with their relationship with the suppliers." Ultimately, a November 6, 2014 email reflects that the VDA, after "really think[ing] about the consequences" of collaborating with SourceOne, decided not to do so. As the email observed, "major suppliers and equipment dealers [are] very upset about this and won't take it laying down. I suspect they will punish [state dental associations] in some way" if they partner with SourceOne.

70. The VDA notes also expose a tactic that Defendants used to deter dentists from buying supplies over the SourceOne/Dental Association Websites. As those notes reflect, "some [dental] offices have had issues when they need service from . . . [Defendants] for something in the office. When they are not ordering from the [Defendant] suppliers, their priority on the repair list seems to slip." In other words, Defendants punished dentists who purchased supplies from IQ over the Dental Association Websites by withholding or delaying service and repair for equipment at those dentists' offices. If dentists wanted Defendants to service their equipment, they had to buy supplies from Defendants.

71. Like other dental associations after the 2014 ADA meeting, the Colorado Dental Association (the "CDA") was, at first, enthusiastic about the prospect of launching a SourceOne website. But the CDA withdrew its interest in January 2015, telling SourceOne that it was "concerned about the major dental suppliers in our area, Schein, Patterson and others pulling their support to the CDA and our largest component society which hosts the Rocky Mountain Dental Conference each year" if it went ahead with the program.

72. The Louisiana Dental Association ("LDA") also planned to launch a Dental Association Website. Fearing Defendants' retaliation, the LDA tried to hide its plan until after its annual trade show. However, Defendants learned of the planned relationship with SourceOne

beforehand, and threatened to boycott the LDA show. In light of the Texas and Arizona associations' damaging experience, LDA yielded to Defendants' threats and abandoned its planned collaboration with SourceOne.

73.     Notably, the Nevada Dental Association, which does not put on a trade show, and thus had less to fear from Defendants' coercion, did launch a Dental Association Website in early 2015. It is the only state dental association that signed up with SourceOne between June 2014 and April 2017.

74.     Likewise, while many manufacturers that rely on Defendants for the distribution of their products pulled their products from the Websites in response to Defendants' threats, manufacturers that had historically sold directly to dentists, thereby bypassing the Defendants and thus generally immune to their boycott threats, generally did not pull their products from the Websites.

75.     Very recently, two state dental associations (Florida and Georgia) have launched new Dental Association Websites. However, the damage caused by Defendants' anticompetitive conduct in the preceding 3-plus years has already been done. That misconduct has severely inhibited the development and spread of the SourceOne model and Dental Association Websites, and has cost IQ years of competitive momentum and advantage, dynamic growth and resultant profits that can never be recaptured.

**E.      Direct Pressure on IQ Dental**

76.     Defendants also pressured manufacturers to boycott and disparage IQ Dental, causing further losses to IQ. That pressure has continued to the present. For example:

77.     Since 2010, IQ Dental has been a distributor for Tuttnauer dental autoclaves. In March 2015, Sergey Kunin, IQ's President, received a call from a Tuttnauer representative who

told Mr. Kunin that if IQ continued to sell Tuttnauer's products through the TDA Perks website, Tuttnauer would pull its product line from IQ. Tuttnauer made that threat -- which was repeated twice more (by email and in person) by Tuttnauer Vice President Paul MacNichol -- under pressure from Schein. To preserve its important relationship with Tuttnauer, IQ was forced to stop selling Tuttnauer products on the TDA Perks website.

78.     In 2015, Air Technique Imaging ("ATI") authorized IQ Dental to distribute ATI's digital imaging products. During the November 2015 New York dental association trade show in New York City, IQ promoted one of ATI's products, the ScanX, at IQ's convention booth. Mr. Kunin then received a text message from an ATI representative directing him to remove the reference to the ScanX from IQ's booth because "I have heard from two different reps from two different companies regarding your showing ScanX" and "I'm getting grief already." The ATI representative told Mr. Kunin that the two other companies, whom he later identified as Schein and Patterson, were unhappy that ATI had authorized IQ to distribute the ScanX and were pressuring ATI to cancel the authorization. IQ was forced to stop promoting the ScanX at its booth.

79.     In 2016, Mr. Kunin spoke with Jeff Wood, Senior Accounts Manager of KaVo Kerr, a major manufacturer of dental products. Mr. Wood told Mr. Kunin that he had received an email from a Patterson representative asking him to pull his product line from IQ Dental because IQ was selling dental products through TDA Perks Supplies.

80.     In September 2016, Mr. Kunin spoke to Bill Ivaroni, a sales representative from Midmark Dental ("Midmark"), about IQ Dental becoming a distributor of Midmark dental equipment. Though IQ met all of Midmark's stated requirements, Mr. Ivaroni told Mr. Kunin that Midmark would not authorize IQ to carry Midmark's product line because Schein and

Patterson would penalize Midmark if it did so.

81.    Late in 2016, Mr. Kunin spoke with Matt Langdon of Professional Sales Associates ("PSA"), which represents dental products manufacturers.  Mr. Kunin asked Mr. Langdon to allow IQ Dental to distribute PSA products.  Mr. Langdon told Mr. Kunin that he could not do so, because Schein and Patterson would penalize PSA.  Specifically, Mr. Langdon said that a Schein representative told him that if PSA allowed lower-cost distributors like IQ Dental to distribute PSA products, then Schein would lower the commission it paid PSA on Schein's sales of PSA products.

82.    In 2016, Mr. Kunin asked John Tobin, President of 3M Dental ("3M"), and 3M's Kathy Gaertner, about the requirements IQ Dental would have to meet to become a distributor of 3M products.  After Mr. Kunin provided 3M with information satisfying those requirements, Mr. Kunin emailed 3M and asked about next steps.  Ms. Gaertner called Mr. Kunin and told him that 3M would not permit IQ Dental to distribute its products, because "We have to protect our distribution network," referring to 3M's relationship with Schein, Patterson and Benco.

83.    In November 2013, Mr. Kunin arranged to meet with a representative of Coltene-Whaledent ("Coltene") at the New York dental trade show to sign an agreement for IQ to become a Coltene distributor. Before that scheduled meeting, Mr. Kunin learned that the Coltene representative was in a meeting with Schein. After its meeting with Schein, and before its scheduled meeting with Mr. Kunin, Coltene abruptly told Mr. Kunin that it was cancelling its plans to open its product line to IQ.

84.    In 2011, representatives of the Danaher Corporation ("Danaher") and its subsidiary DCI called Mr. Kunin about an incident involving a DCI dental product that IQ had sold, which the buyer had attempted to re-sell out of the country.  Mr. Kunin explained that he

knew nothing about it. Mr. Kunin sensed that the DCI/Danaher representatives were looking for an excuse to pull the DCI product line from IQ, and they requested an audit. They were not entitled to an audit, but IQ cooperated, and the audit showed no wrongdoing by IQ. DCI and Danaher took the DCI line away from IQ anyway, under pressure from Schein, which also sells the DCI line.

85. Defendants seek to undermine IQ Dental's business on the customer side by falsely disparaging IQ Dental's products to dentists who are IQ's customers and potential customers. For example, in or around April 2014, a Benco representative sent a letter to a dental practice in Ohio falsely claiming that IQ Dental sold fraudulent, counterfeit goods. Similarly, in February 2017, IQ Dental learned that Patterson had told a customer that IQ Dental was selling products it was not authorized to sell. That was false. Nevertheless, the customer fired the employee who had been buying product from IQ, and stopped buying any product from IQ.

86. Defendants also have made misrepresentations to dentists about the nature and quality of the dental supplies and equipment sold through SourceOne. Defendants have misrepresented those products as expired, counterfeit, altered, sold through unauthorized distribution channels, or otherwise unfit for their intended purpose. Those statements are false as to the products sold by IQ Dental. Defendants made those misrepresentations in an effort to convince dentists that purchasing dental supplies and equipment at discounted prices from IQ Dental and/or through the SourceOne/Dental Association Websites is risky and undesirable. Many dentists curtailed or discontinued their purchases through the Websites including from IQ, after Defendants made those misrepresentations.

## F. Defendants' Long-Standing Conspiracy To Fix Prices and Margins and Suppress Competition

87. As noted earlier, Defendants' anticompetitive campaign against IQ, SourceOne,

and the state dental associations merely continues an unlawful course of conduct that has been ongoing for years. Since at least as early as 2005, Defendants have conspired not to compete on price in the dental products market, so as to maintain their artificially inflated prices and supracompetitive margins. Since then, Defendants have steadily raised those margins, which are currently at 35% or higher – well above what they would be in a competitive market.

88. Defendants have orchestrated their conspiracy through private meetings at professional events, personal gatherings, text messages, phone calls, business and personal email messages, and intermediaries, including sales representatives and executives of dental product manufacturers.

89. The anticompetitive purpose of Defendants' price-fixing scheme is readily apparent in its result: Defendants' have successfully, steadily raised the prices of the products they sell in the face of stagnant or declining demand. Defendants have raised prices in virtual lock step every year since at least 2005, notably including in 2009 when severe economic uncertainty caused patients to defer dental expenses, with a consequent drop in demand for dental supplies, including products sold by Defendants.

90. Defendants' artificially high prices and profit margins should have enticed rival distributors to enter the market and expand their businesses by offering lower prices that still resulted in profitable margins. However, at least as far back as 2008, as part of Defendants' conspiracy not to compete on price, Defendants coordinated boycotts of critical industry participants that did business with those lower-priced rivals. Defendants' aim was to force their rivals to raise their margins to cartelized levels or face being cut off by their key suppliers. Those group boycotts served as an enforcement mechanism that disciplined or eliminated distributors and other market participants that sought to undercut Defendants' artificially inflated

24

prices.

91.     A distributor must have working relationships with an array of manufacturers to be able to offer customers a broad product line.  Above distributors in the supply chain, the manufacturing segment is fragmented, with over 300 manufacturers selling dental supplies and equipment.  Defendants account for the overwhelming portion of individual manufacturers' sales, while each individual manufacturer accounts for a relatively insignificant portion of Defendants' purchases.  In other words, Defendants are much more important to manufacturers than vice versa, giving Defendants power they have collectively wielded to coerce manufacturers to force Defendants' lower-priced rivals to raise their prices or risk being cut off entirely.

92.     Absent the collusive, anticompetitive conduct alleged herein, including the group boycotts, it would be in manufacturers' interest to increase the number of distributors of their products, and to sell through discounting distributors and more efficient and innovative distribution channels and methods.  Smaller distributors typically pay more to manufacturers for products than Defendants do, and sell products to dentists for less.  From the perspective of manufacturers, then, selling to discounting distributors has the potential to make them more money per item and, due to lower end-user prices, to sell more items.  However, because of Defendants' substantial market power and use of group boycotts, manufacturers are instead coerced into pressuring Defendants' rival distributors to raise prices.

93.     Defendants have a long-standing practice of pressuring manufacturers not to deal with other distributors.  Defendants do this by threatening to stop distributing the manufacturers' product, or to pay lower prices for those products, if the manufacturers sell to other distributors.  Given Defendants' overwhelming dominance in the market, manufacturers are forced to comply or face substantial business risks.

25

94.     For example, between 2004 and 2008, Archer & White attempted to obtain rights to distribute products manufactured by A-dec, Inc. ("A-dec"), a manufacturer of dental chairs, intending to sell them at lower margins than Defendants' cartelized ones. A-dec told Archer & White that, as a result of pressure and threats from Schein and Patterson, A-dec had no choice but to refuse to allow Archer & White to distribute A-dec's products. Absent coordinated conduct, this boycott would not have made economic sense. If A-dec had been cut off by Schein alone, it could have shifted its sales to, for example, Patterson, or vice versa.

95.     Defendants also put pressure on a number of other manufacturers from 2008 onward not to deal with Archer & White and/or its partner Dynamic Dental because of their discounted prices, including Midmark, Pelton & Crane, Instrumentarium, SkyScan Dental, Coltene, Bien-Aire Medical Technologies, Airbex, KaVo Kerr Dental, Belmont Equipment, and Royal Dental.

96.     In addition to mobilizing boycotts against rivals they found threatening, and in furtherance of their anticompetitive conspiracy, Defendants also explicitly and collectively sought to fix prices and margins for the distribution of dental supplies and equipment to maintain their own supracompetitive margins.

97.     Defendants agreed among themselves not to actively try to undercut each other's prices as a means of gaining business. For example, Defendants agreed that when one or more of them had sales representatives in the same geographic area, which is the case for most major cities, those sales representatives would not actively pursue one another's existing or nearly-consummated business by trying to undercut each other's prices.

98.     Defendants also worked together to prevent lower-priced rivals from competing on price on pain of losing their product sources.

26

99.     In some cases, Defendants gave lower-priced distributors an explicit choice between joining Defendants' cartel and raising their prices, or facing a campaign of joint pressure by Defendants on manufacturers and other industry participants to cut the lower-priced distributors off.  At least two discount distributors, Archer & White and its joint venture partner, Dynamic Dental, were given such a choice and suffered retaliation from Defendants when they refused to join the conspiracy.

100.    Specifically, in June of 2008, suffering the effects of the group boycott Defendants orchestrated, Archer & White and Dynamic Dental, through sales representative Skip Pettus, met with Schein's Mark Lowery and with Jack Powers of Burkhart Dental Supply Company ("Burkhart").  In that meeting, Mr. Pettus learned of Defendants' longstanding price-fixing conspiracy.  Mr. Lowery and Mr. Powers offered to end the group boycott of Archer & White if Archer & White and Dynamic Dental agreed to maintain margins on their sales of dental products between 32% and 34%, the then-prevailing margin maintained by Defendants' cartel.

101.    During this meeting, Mr. Lowery of Schein told Mr. Pettus that if Archer & White and Dynamic Dental "took price out of the equation, you know, you'd probably get along with – more of the local people."  Mr. Lowery said that he did not want to get beat on a sale "because of price" and that "I'd like to think I know where – where Jack [of Burkhart] is going to come in at [on price]."  Mr. Lowery also said that he "consider[ed] Jack a good competitor.  I like Jack."

102.    Mr. Lowery said at the meeting, referencing the group boycott, "Even your vendors [manufacturers] that you do have, I think you'll get to maintain better relationships with them if you don't drop your drawers [offer low prices]." And that "if I'm not going to do it [enforce the boycott], they're going to put somebody else in my place to do it [enforce the

27

boycott].”

103.    Mr. Pettus asked what he had to do to "get along" with Defendants, to "get to a professional level" or be "accepted into the market" "just like a [Burkhart] or a Patterson is." Mr. Lowery repeated that Archer & White and Dynamic Dental's low pricing was the problem:

> Well, you know, I think the – the big thing is – you know, it goes back to, I don't know that you have to necessarily buy the market. I don't think you do. I think, you know, that's the probably the number one issue for small companies. I mean, that's how they start getting market share and you know, that's – that's a way for them to sell a product, and we all have the ability to drop our drawers. You know we do. But, you know, I think that's – that's part of the – the mutual respect with Jack and us because we all know that . . . We all want to make a living. We want to – we all – all are going to sell it at a – at a good price where we all get paid.

104.    Confirming Defendants' agreement to fix margins, Mr. Pettus asked, "What I'm hearing you say from a company standpoint, . . . [our] margins [have] got to be better [higher], especially on equipment." Mr. Lowery responded, "Yeah. . . . That seems to be the Achilles heel." Mr. Pettus confirmed: "[Our] [l]ow margins on [dental] equipment?" Mr. Lowrey responded, "Yeah."

105.    The conversation became more pointed. Mr. Pettus asked: "Let me just cut right to the – chase . . . We've got some you know, there's indicators by – by manufacturers that there's – there's been direct talk for you and others of: Hey, we just don't want him in existence. Don't open him. Don't do whatever. If we raise our prices, can we get relief from that? . . . If I raise my margins on equipment to an acceptable level . . . can there be relief?" Mr. Lowery responded, "What—what we don't want to do is come across [as] dictating the price to the end user. That will get us in a lawsuit. Guarantee it. But you know, a couple of things. One is I think when everyone plays on the same field, it makes things a lot easier."

106.    Mr. Lowery described how he wanted Archer & White and Dynamic Dental to

fall in line with Defendants' cartelized prices: "If we're both quoting a deal, let's make sure that we're both getting the same thing. . . . [I]f you're not going to be selling it, Jack [Burkhart] is going to be selling it, [or] Patterson's going to be selling it . . . but I just want to make sure we're all on the same page. . . . Will my reps continue to call on your accounts? Absolutely. Will you continue to call on mine? Absolutely. But we know that the customer is making a decision based on who they want to do business with – not because we're slugging it out and killing each other on margins."

107.    When Mr. Pettus asked whether "if I focus on that, if I maintain margins high, can I – I mean, can I rest assured that I . . .," Mr. Lowery interjected with another admission of price fixing: "Let's all just, you know, have the same goal in mind . . . . So that way it takes us out of the loop as far as slugging it out [on margins], and the doctor gets it for the same price no matter who they buy it from."

108.    Questioning what the "same price" was, Mr. Pettus said, "I don't know what's good and what's bad," and Mr. Lowrey responded, "North of 32 [percent margins]." Mr. Pettus responded, "Really?" Mr. Lowrey: "Yeah."

109.    Mr. Pettus again clarified the conspirators' directions: "If I'm buying at the same as you're buying and we're going up competitively against people not against price, I need to be north of 32 every time?" Mr. Lowery's response confirmed the scope of the conspiracy: "You know, unanimously across the industry, as long as I've been in the dental business – 32 – and I know guys that actually get 34 on stuff . . . but you know, generally speaking, you know, 32 is always good . . . If you get 32 . . . everyone is going to get paid on it . . . I think if you get down [to] 28, we all don't make a lot." Mr. Lowrey reiterated: "that's where we play ball at."

110.    Former employees of Patterson and Benco who worked for those Defendants

during the relevant time period have confirmed the breadth and scope of Defendants'

overarching agreement not to compete on price, and the fact that Defendants had similarly supra-

competitive margins nationwide since at least 2004.

## G.     The Relevant Market

111.    One relevant antitrust market in which to evaluate the Defendants' conduct is the

market for the marketing, distribution and sale of dental supplies in the United States.

112.    One relevant market in which to assess the Defendants' conduct is in the market

for the marketing, distribution and sale of the full line of dental supplies in the United States.

Due to substantial economies of scale, or savings from "one stop shopping," in the marketing,

distribution and sale of dental supplies, dentists generally prefer to purchase dental supplies from

a supplier that can offer a full line of dental supplies, including acrylics, alloys and amalgam,

anesthetics, burs, cements and liners, disposable paper and cotton supplies, endodontic products,

handpieces, impression products, instruments, orthodontics, preventive products, retraction

materials, surgical products, waxes and x-ray products.  Buying these goods from a single seller

significantly reduces dentists' transaction costs, because purchases of dental supplies are

characterized by regular repeat purchases, each of which is of relatively small value. Purchasing

dental supplies from full-line sellers offers dentists convenience and service characteristics that

set full-line sellers apart from other sellers, including an efficient way to obtain dental supplies

through centralized warehousing, delivery, and billing services that enable dentists to avoid

carrying large inventories, dealing with a large number of vendors, and negotiating numerous

transactions. Because dentists strongly prefer to purchase dental supplies from a single firm,

firms selling only a partial line of dental supplies will not compete effectively with firms

supplying the full line of dental supplies. For all of these reasons, a hypothetical monopolist

supplier of a full-line of dental supplies would be able to profitably increase the price of the full

30

line of dental supplies above the competitive level, as shown by the Defendants' ability to charge supra-competitive prices for the full line of dental supplies that each carries.

113.    Alternatively, the Defendants' conduct may be assessed in the market for the marketing, distribution and sale of specific types of dental supplies in the United States. Because the various types of dental supplies, including acrylics, alloys and amalgam, anesthetics, burs, cements and liners, disposable paper and cotton supplies, endodontic products, handpieces, impression products, instruments, orthodontics, preventive products, retraction materials, surgical products, waxes and x-ray products, are not functionally interchangeable from the standpoint of consumers, a hypothetical monopolist of each such product or product type could profitably increase the price of each such product or product-type above the competitive level.

114.    Another relevant market in which to evaluate the Defendants conduct is the market for the marketing, distribution and sale of durable dental equipment in the United States, including amalgamators, amalgam separators, curing lights, operatory lights, x-ray equipment, lasers, sterilization equipment, vacuum systems, and other types of equipment used in dental practices.  Equipment used in dental practices is generally customized for the needs of those practices, no other products or product types significantly constrain the prices of dental equipment, and a hypothetical monopolist of a full line of dental equipment, or of each such product or product type, could profitably increase the price of each such product or product-type above the competitive level.

115.    The Defendants collectively have substantial market power in the relevant market or markets, however defined.

**H.    <u>Defendants' Unlawful Conduct</u>**

116.    Defendants agreed with one another, and with other distributors presently

31

unknown to IQ, to boycott dentists, manufacturers and state dental associations that dealt with, or considered dealing with, SourceOne or IQ. The Defendants had a conscious commitment to a common scheme to prevent the emergence of a viable competitor, to exclude IQ from the relevant market, and to eliminate IQ as an effective competitor, by virtue of this agreement and the overt acts taken pursuant to this agreement. Defendants took overt acts in furtherance of this conspiracy, including the anticompetitive and tortious conduct alleged herein.

117.    Injury to IQ was the direct, foreseeable and intended result of the Defendants' boycott of dentists, manufacturers and state dental associations. The Defendants' boycott simultaneously harmed IQ and consumers in the relevant market by excluding IQ and thereby artificially maintaining or increasing the prices paid by dentists for dental supplies. Although the mechanism of injury to IQ and to dental professionals (and thereby to consumers) is the same, the damages caused by Defendants' boycott to dental professionals in the form of higher prices is distinct from, and not duplicative of, the damages caused to IQ, in the form of lost profits and damaged equity and goodwill. IQ is the most direct victim of the Defendants' boycott, and apportionment of the harms suffered by IQ and those suffered by less-direct victims of the boycott, including state dental associations and dental professionals, will not be difficult.

## CLAIMS FOR RELIEF

### COUNT I

### Unreasonable Restraint of Trade

118.    IQ Dental restates as if fully set forth herein the allegations set forth in ¶¶ 1 through 117 of this Complaint.

119.    Defendants are horizontal competitors of IQ Dental that harmed IQ Dental through their unlawful conspiracy, furthered by, among other things, agreements to boycott or

threaten to boycott market participants, including trade associations, manufacturers, and customers that were or were considering doing business with lower-priced rival distributors, including IQ Dental; to disparage products sold by IQ Dental and others; and to fix prices for dental supplies and equipment.  Defendants' conduct constitutes a conspiracy that is *per se* unlawful.

120.    Defendants' conduct as alleged herein constitutes unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; the Donnelly Act, N.Y. Gen. Bus. Law §§ 340 *et seq.*; and the New Jersey Antitrust Act, N.J.S.A. §§ 56:9-1 *et seq.*

121.    Defendants' agreement with one another, and with known and unknown co-conspirators, that each would boycott state dental associations, dentists, dental supplies and equipment distributors, and dental supplies and equipment manufacturers doing business with IQ Dental and through SourceOne was a *per se* unlawful group boycott, or, in the alternative, was an unlawful restraint under the rule of reason.

122.    Injury to IQ Dental was the direct, foreseeable, and intended result of Defendants' unlawful conduct.  Defendants' conduct has damaged IQ Dental in the form of lost profits and damaged equity and goodwill, diminishing the value of IQ Dental as a going concern in an amount to be proven at trial.

**COUNT II**

**Tortious Interference with Prospective Business Relations**

123.    IQ Dental restates as if fully set forth herein the allegations set forth in ¶¶ 1 through 122 of this Complaint.

124.    Defendants' conduct as alleged herein in arranging group boycotts against state dental associations to pressure them not to deal through SourceOne's web platforms has

33

interfered with IQ Dental's prospective business relations with the members of those state dental associations.

125.     Defendants' conduct as alleged herein in misrepresenting the nature and quality of IQ Dental's products to dentists has deterred dentists from dealing with IQ Dental and constitutes tortious interference with IQ Dental's prospective business relations with those dentists.

126.     Defendants' conduct as alleged herein in misrepresenting to dental supplies and equipment manufacturers that IQ Dental was selling products through the SourceOne Websites without authorization has deterred manufacturers from dealing with IQ Dental, thereby restricting the products available for IQ Dental to distribute to dentists, and constitutes tortious interference with IQ Dental's prospective business relations with those dentists.

127.     Defendants' conduct as alleged herein in withholding service from dentists who also purchased products from IQ Dental has deterred dentists from dealing with IQ Dental and constitutes tortious interference with IQ Dental's prospective business relations with those dentists.

128.     Defendants' conduct as alleged herein was intentional, meant to and did injure IQ Dental's prospective business relationships, and was without justification.

129.     That conduct has damaged IQ Dental in the form of substantial lost profits and damaged equity and goodwill, diminishing the value of IQ Dental as a going concern in an amount to be proven at trial.

## COUNT III

### Civil Conspiracy

130.     IQ Dental Supply restates as if fully set forth herein the allegations set forth in ¶¶ 1 through 129 of this Complaint.

34

131.    Defendants made an agreement to act in concert in violation of federal and state antitrust laws with the intent to harm IQ Dental.

132.    That conduct has damaged IQ Dental in the form of lost profits and damaged equity and goodwill, diminishing the value of IQ Dental as a going concern in an amount to be proven at trial.

**COUNT IV**

**Aiding and Abetting**

133.    IQ Dental restates as if fully set forth herein the allegations set forth in ¶¶ 1 through 132 of this Complaint.

134.    Each Defendant was aware of the anticompetitive conduct of the other Defendants in violation of state and federal law and rendered substantial assistance to the other Defendants in violating those laws with the intent to damage IQ Dental.

135.    That conduct has damaged IQ Dental in the form of lost profits and damaged equity and goodwill, diminishing the value of IQ Dental as a going concern in an amount to be proven at trial.

**<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiff IQ Dental respectfully requests the following relief:

a.    An Order permanently enjoining Defendants from entering into agreements to pressure third parties, including dental supplies and equipment manufacturers and dentists, from doing business with IQ Dental, and from engaging in such conduct;

b.    On Count I, an award of compensatory and trebled damages in an amount to be proven at trial in favor of IQ Dental and against all Defendants, jointly and severally, including all interest thereon;

35

      c.     On Counts II, III, and IV, an award of compensatory and punitive damages in an amount to be proven at trial in favor of IQ Dental and against all Defendants, jointly and severally, including all interest thereon;

      d.     An award to IQ Dental of reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

      e.     Such other and further relief as this Court deems just and proper.

Dated: New York, New York
       August 17, 2017

                       Respectfully submitted,

                       DUANE MORRIS LLP

                       By: _William B. Pollard, III_

                         William B. Pollard, III
                         Lawrence C. Fox
                         J. Manly Parks
                         Amy C. Gross

                       Attorneys for Plaintiff
                       IQ Dental Supply, Inc.

36